IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | | |
|---|---|---|
| Shauntell Burton and and on behalf of those similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | C/A NO.: |
| vs. | ) ) | COMPLAINT |
| National Association of REALTORs, Keller Williams, LLC, and Keller Williams Realty, Inc., | ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

The Plaintiffs, complaining of the Defendants, would show unto the Court:

**NATURE OF ACTION**

1.    Plaintiff, a home seller who listed their homes in South Carolina on Multiple Home Listing Services ("MLS") in South Carolina, bring this action on her own behalf and on behalf of all others similarly situated against Defendants for agreeing, combining, and conspiring to impose and enforce an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes, and to pay an inflated amount, in violation of federal antitrust law.

2.    Defendants are the National Association of REALTORs ("NAR") and one of the largest national real estate

brokers, Keller Williams, LLC.  The latter broker is at times referred to as the Corporate Defendants and, when the National Association of REALTORS is included, the group shall be referred to as the Defendants.

3.    Real estate brokers handle most residential real estate sales in the United States.  In a typical transaction, one broker will represent the seller, and another broker will represent the buyer of a home.  Both the buyer broker and seller broker (also known as the listing broker) are paid a percentage of the property's sales price.  Currently, total broker compensation in the United States is typically five to six percent of the home sales price, with approximately half of that amount paid to the buyer broker.

4.    Real estate brokers do not specialize in either buyers or sellers and so are often the buyer broker in one transaction and the selling broker in another.

5.    The cornerstone of Defendants' conspiracy is NAR's adoption and implementation of a rule that requires all seller's brokers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation (the "Adversary Commission Rule") when listing a property on a Multiple Listing Service. This rule is found on Page 39 of the NAR's Handbook on MLS Listing Policy.  Those pages cited in this complaint are attached as Exhibit 1.

6.    An MLS is a database of properties listed for sale in a particular geographic region.  The vast majority of homes in the United States are sold on an MLS marketplace.  Brokers, if they are members of an MLS, are required to list all properties on the MLS.

7.    The MLSs are controlled by local NAR associations, and access to such MLSs is conditioned on brokers agreeing to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy.  The Adversary Commission Rule is a mandatory rule in NAR's Handbook.

8.    Defendants and their co-conspirators collectively possess market power in local markets for real estate broker services through their control of the local MLS.

9.    Due to Defendants' conspiracy, NAR conditions a broker's access to and use of NAR's MLSs on a broker's agreement to adhere to and implement terms that restrain competition.

10.   Each of the Corporate Defendants plays an active role in NAR and mandates that franchisees, brokerages, and individual REALTORs join and implement NAR's anticompetitive rules, including the Adversary Commission Rule, otherwise these parties would not receive the benefit of the Corporate Defendants' branding, brokerage infrastructure, and other support.

11.    As the leading brokers in the United States and

3

South Carolina, in particular, their knowing acts of forming and/or joining and participating in the conspiracy, by implementing and enforcing its rules and policies, is essential to the conspiracy's success.

12. The unlawful restraints implemented and enforced by the conspirators benefit NAR and the Corporate Defendants, furthering their common goals by permitting brokers to impose supra-competitive charges on home sellers and restrain competition by precluding competition from innovative or lower-priced alternatives.

13. In competitive foreign markets, home buyers pay their brokers, if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United States. In markets not affected by any policy like the Adversary Commission Rule, buyer brokers are paid by home buyers and so are forced to compete to some extent on price and experience. According to the Executive Director of the Consumer Federation of America, total commission rates range "between 1% and 4%," whereas the typical total commission rate in the United States, a putatively free market economy, remain between 5% and 6%, which is no lower than it was in 2001 despite substantial increases in the value of homes and significant advances in technology.

14. Even the NAR admits that United States commissions remain higher than other, similarly developed international

4

markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium.

15.   The Adversary Commission Rule, together with other anticompetitive rules imposed by the NAR, explains why commissions in the United States remain artificially and anticompetitively elevated beyond where they are in markets free from conspiracies like the Defendants'.

16.   Defendants use their control of the MLSs – which the Corporate Defendants control by and through their agreements with their local franchisees, their employee policy and procedures manuals, their training documents, and leadership roles in the NAR and its constituent local REALTOR associations – to require brokers in local residential real estate markets to adhere to NAR's rules, including the Adversary Commission Rule.

17.   The Corporate Defendants further implement the conspiracy by reviewing NAR's Rules and agreeing to them at yearly meetings.

18.   NAR further advances the conspiracy by re-issuing its Rules (including the Adversary Commission Rule) every year, reaffirming these rules even after being put on notice of their anticompetitive effect.

19.   Corporate Defendants participate in and implement the conspiracy by serving on boards and committees that enforce compliance with NAR rules through both "carrots and sticks."

5

20.    Through these actions, and others alleged in this Complaint, each of the Defendants has taken actions to further the conspiracy and thereby have agreed to join, participate in, facilitate, and implement the conspiracy.

21.    Defendants' conspiracy has kept buyer broker commissions in the 2.5% to 3.0% range for many years despite the diminishing role of buyer brokers.  Many home buyers no longer search for prospective homes with the assistance of a broker, but rather independently through online services.  Upon information and belief, NAR and the Corporate Defendants have studied and are aware of this trend and fact.

22.    Prospective home buyers increasingly retain a buyer broker after the client has already found the home a client wishes to purchase.  Buyer broker commissions, however, have not fallen in recognition of this diminished role.  Indeed, in real monetary terms, buyer broker commissions have increased because of the skyrocketing prices of homes, as they are calculated as a percentage of the home price.

23.    Defendants' success in maintaining the same artificially and anticompetitively inflated commission rates despite these technological and social changes starkly contrasts with results in other industries.  The introduction of the internet and innovative and discount service providers have provided enormous financial benefits to consumers of numerous

goods and services in various sectors like travel booking, insurance, banking, and stock brokering, as well as retailing.

24.    Transaction costs have dramatically decreased among a myriad of more poorly organized markets and prices in those markets have mirrored that decline.  Real estate sales have not because of the anticompetitive Adversary Commission Rule and the fact that listing agents today will be buyer brokers tomorrow.

25.    This market failure is best illustrated by the fact that a buyer broker's costs per house sold are roughly the same.  However, that buyer broker's commission on a house that costs $2,500,000 is substantially higher than one that costs $250,000.  In a rational market, given the costs to the buyer broker are roughly the same for each house sold, the percentage fee charged should decrease as the price increases.  While the buyer broker may still receive a higher monetary fee for the purchase of the $2,500,000 house based on the home buyer's ability to pay, as a percentage fee, it would rationally be lower.  Instead, due to Defendants' conspiracy and anticompetitive market manipulation and rent seeking, the commission structure overcharges sellers and has little relation to the quantity or quality of the buyer broker's services or the value the buyer broker serves.

26.    This structure further imposes agency costs on the

buyer.  Where a buyer broker's commission, to be paid by the seller, is set as a percentage of the home's sale price, the buyer broker is incentivized to harm her buyer in two ways.

27.  The first is the practice of "steering."  Given the requirement that the listing agent make a blanket, unilateral offer of commission to buyer brokers, and the fact that these listing agents generally have an incentive to fit the commission to the "standard" commission available in the real estate market, buyer brokers face strong incentives to steer their buyer clients to higher priced homes to receive a higher real dollar commission.

28.  The other is that a buyer broker has strong incentive not to negotiate down the sales price of a house, but rather to add items to the contract.  In other words, the buyer broker has an incentive to ensure that the buyer pays the sales price of the house, with any negotiations, to the extent that they take place at all, centered on other possible items like furnishings staying with the house, maintenance credits, etc.

29.  Economic studies have documented and confirmed the prevalence and significance of steering and further "suggest that this could limit price competition."

30.  Given that buyer brokers will not show homes to their clients where the seller is offering a lower buyer broker commission, seller brokers face pressure to conform their

unilateral blanket offer to the standard commission rates offered in a particular locality.

31.   Further, seller brokers in one transaction are buyer brokers in another, and so are incentivized to enforce a standard commission rate that is insensitive to price competition.

32.   In sum, the conspiracy herein complained of has multiple illogical, harmful, irrational, and anticompetitive effects, including that it: (a) requires sellers to pay supra-market rates for services provided by buyer brokers to the buyer, the seller's adversary in the transaction; (b) raises, fixes, and maintains buyer broker compensation at levels that would not exist in a competitive marketplace; (c) encourages and facilitates steering and other agency costs that impede innovation and entry into the market by new and lower-cost real estate brokerage service providers.

33.   Defendants' conspiracy, by inflating buyer broker commissions, has inflated the total commissions paid by home sellers such as Plaintiff and the other Class members, causing the Plaintiff and other class members to incur thousands of dollars in overcharges and damages as a result of the Defendants' conspiracy.

34.   In a properly competitive market, one not affected by Defendants' conspiracy in restraint of that market, the seller

9

would pay nothing to the buyer broker, who would be paid instead by their client, the buyer, and the total commission paid by the seller would be set at a level to compensate only the seller broker.  Even where the seller paid the buyer broker's compensation, that compensation would be subject to consideration offered by the buyer, would be subject to negotiations between the seller and the buyer through their respective agents, and, based on experience from other developed real estate markets, would be substantially lower than the current 2.5 to 3 percent that is currently and typically paid to the buyer brokers.

35.  Moreover, in the absence of the Adversary Commission Rule, seller brokers would likely face competitive pressures to set commissions to pay themselves and would engage in vigorous competition to lower rates and/or provide additional services to justify their newly transparent rates.

36.  Plaintiff, on behalf of themselves and the Class, sue for Defendants' violations of federal antitrust laws as alleged herein and seek treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

## JURISDICTION AND VENUE

37.  This court has subject matter jurisdiction under 28 U.S.C. §§1331, 1337 and 15 U.S.C. §4 because the suit raises a federal question and "aris[es] under [an] Act of Congress regulating commerce or protecting trade and commerce against

restraints and monopolies."

38.   This Court further has subject matter jurisdiction under 28 U.S.C. § 1367 over any state law claims made because those claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Those claims further do not raise novel or complex issues of state law, substantially predominate over the claim over which the district court has original jurisdiction, nor is there any compelling reason for the court to decline jurisdiction.

39.   This Court has independent subject matter jurisdiction over state law claims in this action based upon 28 U.S.C. § 1332(d)(2) because the Class as defined here contains more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from one of the Defendants.

40.   This Court has personal jurisdiction over Defendants, each of which will be properly served.  Defendants have: (1) transacted substantial business throughout the United States and the District of South Carolina, (2) transacted business with members of the Class within the United States and the District of South Carolina, (3) had substantial contacts with the United States and the District of South Carolina, and (4) committed substantial acts in furtherance of their unlawful

scheme in the United States and the District of South Carolina.

41.    Each Defendant transacts substantial business within the District of South Carolina.

42.    Each of the Corporate Defendants has extensive business operations, to include brokerage subsidiaries, franchisees, and/or affiliates, which collectively are involved in a substantial number of residential real estate listings in the various MLSs that comprise the District of South Carolina's real estate market and a substantial number of the sales of homes listed in the District of South Carolina through those various MLSs.

43.    Each of the Corporate Defendants has received millions of dollars in revenue attributable to business transacted in the District of South Carolina from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in South Carolina.

44.    NAR collects substantial revenues and fees from its nationwide membership, to include substantial numbers of members located and transacting business in the District of South Carolina.  NAR reported on its 2020 IRS Form 990, the first page of which is attached as exhibit 2, that it received $268,602,796 in member dues nationally.  Accordingly, during the Subject Class period, NAR has collected millions if not tens of millions of dollars in membership dues and revenue from real estate

brokerages, brokers, and/or REALTORS operating in the District of South Carolina.

45.  NAR conducts and transacts substantial business in the District of South Carolina through its involvement in drafting, reviewing, and publishing regularly updated editions of the "Interpretations of the Code of Ethics," which it updates yearly.

46.  NAR's Interpretations of the Code of Ethics reflects that NAR, through its Professional Standards Committee, interacts and conducts business with arbitration Hearing Panels and Boards of Directors of local real estate associations (including the local associations operating in areas covered by MLSs and those that actively operate those MLSs) to review and articulate policies and principles that are applied in specific disputes involving REALTORS.  These Interpretations are often mandatory and govern arbitral rulings within the District of South Carolina in disputes between REALTORS.

47.  NAR requires each of the Corporate Defendants, as well as other co-conspirators operating in the District of South Carolina, to comply with NAR policies, including its Handbook on Multiple Listing Policy and Code of Ethics.

48.  Among the policies that NAR requires the Corporate Defendants and their co-conspirators to follow in this District is the Adversary Commission Rule.

13

49.  Upon information and belief, NAR actively monitors and polices the Corporate Defendants and other co-conspirators operating in the District to ensure full compliance with its Rules and Policies, including the Adversary Commission Rule. Failure to comply with these policies, to include the Adversary Commission Rule, will result in the removal of the entity or individual from the NAR membership and, in turn, expulsion from the MLSs that comprise the real estate market of the District of South Carolina.

50.  NAR and its state and local affiliates engage in substantial lobbying aimed at various governmental entities and political candidates at every level of government.  In the period beginning January 1, 2023 and ending May 1, 2023, for example, the South Carolina Association of REALTORS, the state level affiliate of the National Association of REALTORS, paid lobbyists $75,000 and made another $178,359.70 in expenditures in the District of South Carolina.

51.  Venue is proper in this District under 15 U.S.C. §22 and under 28 U.S.C. §1391(b),(c), and (d).  Each Defendant transacted business, was and is found, had agents and/or resided in this District; a substantial portion of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

14

52.  The Adversary Commission Rule and other anticompetitive NAR rules apply and have been implemented by Defendants and co-conspirators in interstate commerce, including in this District.  These rules govern the conduct of local NAR associations, local brokers, and local sales agents across multiple states, including but not limited to South Carolina and its MLSs.

53.  Defendants' conduct alleged herein has inflated buyer broker commissions nationwide, including in this District, and has injured home sellers in this District and nationwide. Defendant NAR, through its members and other co-conspirators, and the Corporate Defendants, through their franchisees, subsidiaries, and/or affiliates, and other co-conspirators, are engaged in interstate commerce, and are engaged in activities affecting interstate commerce within the United States.

## **THE PARTIES**

**Plaintiff**

54.  Plaintiff Shauntell Burton sold a house through a local affiliate of Keller Williams, LLC in Spartanburg, SC in September of 2023.  That house was listed through a local MLS, owned by the Spartanburg Association of REALTORS, a local affiliate of the NAR.  Upon information and belief, that MLS complies with the various mandatory rules set by the NAR. She paid a buyer's commission of 2.50 per cent, total commission of

6.00 per cent.  The Seller's Settlement Statement is attached as Exhibit 6.

**Defendants**

55.  Defendant National Association of REALTORs, a group that advocates for the interests of real estate brokers and provides mandatory rules to those real estate brokers, has over 1.2 million individual members from whom it has collected hundreds of millions of dollars in dues and membership fees during the Class period, including millions of dollars in dues and membership fees from NAR members located within this District.  NAR oversees fifty-four state and territorial REALTOR associations and over 1,200 local REALTOR associations.  NAR is headquartered in Chicago, Illinois.

56.  NAR further holds the copyright over the term REALTOR, so to use that term requires membership in NAR and/or one of its various affiliates.

57.  Defendant Keller Williams, LLC ("Keller Williams") is a privately held company headquartered in Austin, Texas. It is one of the nation's largest real estate brokerages and franchises local Keller Williams brokers around the country, including numerous franchisees that transact substantial business in the District of South Carolina.

58.  Defendant Keller Williams Realty, Inc. is a privately held company headquartered in Austin, Texas.  It is one

16

of the nation's largest real estate brokerages and franchises local Keller Williams brokers around the country, including numerous franchisees that transact substantial business in the District of South Carolina.  Keller Williams Realty, Inc. is not authorized to transact business in the State of South Carolina in its own name.  It is unclear the relationship between Keller Williams, LLC and Keller Williams Realty, Inc., however, upon information and belief, Keller Williams Realty, Inc. has policy making authority over the various franchisees located in the District of South Carolina.  When the term "Keller Williams" is used, this is in reference to both Keller Williams, LLC and Keller Williams Realty, Inc..

59.  Each of the Defendants has a significant presence in the markets contained within the District of South Carolina, membership within the MLSs that comprise the real estate market of the District of South Carolina, and transact substantial business in the District of South Carolina.

**Co-Conspirators and Agents**

60.  In addition to the named Defendants, there are several other large, national brokerages that have extensive business operations, to include brokerage subsidiaries, franchisees, and/or affiliates, which collectively are involved in a substantial number of residential real estate listings in the various MLSs that comprise the District of South Carolina's

real estate market and a substantial number of the sales of homes listed in the District of South Carolina through those various MLSs.

61.    These large national brokerages have received millions of dollars in revenue attributable to business transacted in the District of South Carolina from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in South Carolina.

62.    These large national brokerages are equal participants in the conspiracy complained of herein and take similar steps as the named Defendants.

63.    These brokerages are also members of the NAR, as well at its state and/or local affiliates and participate in and implement the conspiracy by serving on boards and committees that enforce compliance with NAR rules through both "carrots and sticks."

64.    There are many other local REALTOR associations and real estate brokers participating as co-conspirators in the violations alleged herein and performing acts and making statements in furtherance thereof.  Specifically, all who own, operate, and participate in MLSs within the District agree to, comply with, and implement the Adversary Commission Rule.

65.    By adopting the Adversary Commission Rule, the MLSs that make up the real estate market of the District of South

Carolina and their members have participated as co-conspirators in the antitrust violations and unfair practices alleged herein and performed acts and made statements in furtherance thereof.

66.   In order to gain access to the Corporate Defendants' infrastructure, branding, promotional materials, and other support, the franchisees and brokers of the Corporate Defendants have agreed to, complied with, and implemented the Adversary Commission Rule in the geographic areas covered by the MLSs making up the residential real estate market of South Carolina and thereby have participated as co-conspirators in the antitrust violations and unfair practices alleged herein and performed acts and made statements in furtherance thereof.

67.   Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

<u>**FACTUAL ALLEGATIONS**</u>

**Real Estate Background**

68.   South Carolina state licensing laws regulate who can represent sellers and buyers in the real estate market. There is a real estate broker-in-charge of each brokerage.  This broker-in-charge is responsible for the supervision of the brokerage's brokers and salespersons. Those brokers and salespeople are defined as "associated licensees."  If and when those brokers or salespeople leave a particular broker-in-charge,

they are required to notify the real estate commission
immediately.  These brokers-in-charge are legally responsible for
the associated licensees.

69.    Brokers-in-charge and their associated licensees
occupy dual roles in that they act as selling brokers for some
home sales and act as buyer brokers in other home sales.

70.    According to NAR, 92% of sellers sold their home
with the assistance of a real estate broker in 2017 and 87% of
buyers purchased their home with the assistance of a real estate
broker that same year.

71.    In typical residential real estate transactions,
brokers-in-charge and associated licensees receive compensation
through commissions that are calculated as a percentage of a
home's sale price and the commissions are paid when the home
sells.

72.    A seller broker's compensation is set forth in a
listing agreement made between the seller and the seller broker.
This agreement includes terms of the listing and often provides
that the seller broker has exclusive rights to market the
seller's home.  Due to the Adversary Commission Rule, the listing
agreement specifies the total commission that a home seller will
pay to the seller broker and also specifies the amount to be paid
to the buyer broker in the likely event that there is one.

73.    When a buyer retains a broker, the buyer enters

into a contract with that broker for the broker to act as his agent.  The contract generally discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

74.  If the buyer has a broker, as almost all of them do, the seller broker pays the buyer broker a commission out of the total commission paid by the seller.

75.  The result of these agreements and the Adversary Commission Rule is that buyer brokers – agents of the buyer in negotiations against the seller – receive their compensation from the total commission paid by the seller, not from the buyer they represent.

76.  This compensation arrangement means that a buyer broker is better compensated when his negotiations to lower a house's price fail than should they succeed.

77.  Absent the Adversary Commission Rule and in a competitive market, a buyer would pay his or her broker, taking into account that buyer broker's experience within the market, price, and other relevant factors.  The seller would agree to pay her own broker a commission.  The seller's broker commission, then, would be approximately half (or less) than the amount that sellers have paid as a total commission to compensate bother their selling broker and the adversarial buyer's broker.

78.  The seller, of course, would have the option of

compensating the buyer broker, but would use that as a negotiating tool after negotiations have been joined, rather than as a prerequisite for joining the market.

**Multiple Listing Services and the Adversary Commission Rule**

79.  An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their REALTORS or agents, if they are in compliance with the rules of the MLS.  MLSs in the District of South Carolina are owned and operated by local REALTOR associations that are members of, and governed by, NAR.

80.  As required by NAR rules, seller brokers who are members of an MLS list their clients' property on that area's MLS within one business day of marketing that property to the public. If a seller broker does not list a client's property on an MLS, most buyer brokers will not show that property to prospective buyers.  Even more detrimentally, MLSs act as the main source of listings for online websites like Zillow, REALTOR.com, and Redfin.  Many, if not most, home buyers find listings through such websites.

81.  The Adversary Commission Rule requires a seller broker, on behalf of the seller, to make a blanket, unilateral and effectively non-negotiable offer of compensation to buyer brokers whenever listing a home on an MLS owned by a local NAR association.

82.    If a buyer represented by a broker purchases the home, then the buyer broker receives the offered compensation.

**Anticompetitive NAR Rules**

83.    The Adversary Commission Rule was adopted by NAR in 1996 in its Handbook on Multiple Listing Policy ("Handbook") and has been in effect ever since.

84.    Prior to this policy enactment, NAR, its affiliates, and other conspirators designed, implemented, and enforced a policy that created a bizarre market structure that made the buyer broker into a sub-agent of the seller where the buyer broker was not the seller's broker.

85.    This market structure also ultimately required the seller to compensate both the buyer broker and the seller broker.

86.    This arrangement collapsed under the weight of press coverage rather rapidly.

87.    To replace the market structure, but retain the compensation structure, the NAR and its co-conspirators implemented and enforced the present anticompetitive and deceptive scheme to ensure the continued existence of supra-market rate commissions and impeded innovation and lower-priced competition.  The lynchpin of this scheme is the Adversary Commission Rule, which requires that the seller make blanket, unilateral offers of compensation to buyer brokers when listing a home on an MLS.

23

88.   The NAR Board of Directors, and committees reporting to it, determine from time to time whether to modify any policies in the Handbook, and the Board has approved certain changes in recent years within the MLSs that make up the real estate market of the District of South Carolina.

89.   All policies, whether retained, modified, or new, are then incorporated in the new editions of the Handbook.  That Handbook is almost always issued annually.

90.   The Board of Directors of NAR has consistently and repeatedly agreed and chosen to retain the Adversary Commission Rule in the Handbook even in the face of criticism by economists and industry experts that the Adversary Commission Rule is anticompetitive and causes supra-market commission rates.

91.   In revising and re-issuing the Handbook, NAR has invited each of the Corporate Defendants and other conspirators to participate in the agreement, combination, and conspiracy defined herein.

92.   Each conspirator, to include the Corporate Defendants, may participate in the various MLSs that make up the real estate markets of the United States, particularly in this case those comprising the real estate market of the District of South Carolina, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook.

24

93.   Each conspirator, to include the Corporate Defendants, have, without fail, participated in those various MLSs.

94.   As such, the Corporate Defendants, to the extent that they claim not to have authored the Handbook itself, the Adversary Commission Rule, or the other anticompetitive rules contained therein, have still agreed to abide by, implement, and enforce those policies, to include the Adversary Commission Rule.

95.   In defining what an MLS is, NAR defines it as "a means by which authorized participants make blanket unilateral offers of compensation to other participants." Ex. 1 at p. 3. This statement admits that the Adversary Commission Rule is fundamental to the MLS system.

96.   The Handbook goes on to state on page 39 the Adversary Commission Rule this way:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants.

97.   The Handbook also requires on page 40 that

> The multiple listing service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service shall not publish the total negotiated commission on a listing which has

25

been submitted to the MLS by a participant.
The multiple listing service shall not
disclose in any way the total commission
negotiated between the seller and the listing
broker.

98.   The Handbook also states on page 40

Multiple listing services shall not publish
listings that do not include an offer of
compensation expressed as a percentage of the
gross selling price or as a definite dollar
amount, nor shall they include general
invitations by listing brokers to other
participants to discuss terms and conditions
of possible cooperative relationships.

99.   NAR's Code of Ethics, which is attached as Exhibit

3, Standard Practice 16-16, states:

REALTORS®, acting as subagents or
buyer/tenant representatives or brokers,
shall not use the terms of an offer to
purchase/lease to attempt to modify the
listing broker's offer of compensation to
subagents or buyer/tenant representatives or
brokers nor make the submission of an
executed offer to purchase/lease contingent
on the listing broker's agreement to modify
the offer of compensation.

100.   The effect of these rules is not simply that the

seller must pay the buyer broker's compensation.  These rules

effectively take the compensation structure out of the view of

the buyers and sellers, masking who pays the buyer broker's

compensation.

101.  These rules further ban the negotiation of the

buyer broker's total compensation by either their principal, the

buyer, or the party paying the compensation, the seller.  Indeed,

a buyer broker may not even present an offer to a seller that is conditional on the seller reducing the buyer broker commission.

102. The Adversary Commission Rule shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. This rule, when coupled with Standard Practice 16-16, is simply not economically rational.

103. The Adversary Commission Rule creates a chain reaction of obligations of which a home seller is not aware. That home seller, in hiring a seller broker to market her home to the public, is not simply hiring a seller broker, the service she wants. If that seller broker is a member of the MLS system, as he must be for his business to be economically viable or in order to take advantage of the Corporate Defendants' various branding, training materials, and other support, that seller broker must publish the home on the MLS serving that geographical region, whether the seller wishes it or not. Further, because the seller broker is obligated to publish that home on the MLS, the seller is obligated to provide a unilateral offer compensation to an as yet unidentified buyer broker, thus tying the seller's purchase of a seller broker to the purchase of an as yet unidentified buyer broker member of the MLS serving that geographical region.

104. This is a tying transaction because both the seller broker and the buyer broker are affiliated through NAR, the association through which MLS rules are promulgated and

enforced.

105. The seller has an economic interest in the tying mechanism because the now-seller broker will be a buyer broker in a different transaction within the MLS.

106. Further, members of the MLSs that comprise the real estate market of the District of South Carolina are almost always REALTORS. While it is not required that a REALTOR be a member of an MLS, Ex. 1 at 30, it is generally required that, to be a member of an MLS, one ought to be required to be a member of the local associations, Id. As such, the NAR, as a trade association, is promoting its members' economic interest by promoting, requiring, and enforcing the anticompetitive tie.

107. The blanket, unilateral offer of compensation provides incentive for a seller broker to set his compensation level at the standard compensation rate because he will often be a buyer broker in other transactions. The system thus fostered essentially leads to one in which the brokers, regardless of which side of the transaction they are on, agree to split an artificially high commission rather than compete on the basis of factors the market deems valuable, like level of service, price, experience, actual work performed, etc.

108. NAR has further published case interpretations which ensure and exacerbate the anticompetitive effects of both its ethical rules and its Handbook policies.

28

109. But for the Adversary Commission Rule and other anticompetitive rules and policies of NAR, buyers (not sellers) would pay the commission to their broker. Brokers would have to engage in competition by offering lower commissions to prospective buyers.

110. Selling brokers would face downward pressure on total commissions and renewed competition to earn business from home sellers, as seller brokers would no longer be calculating their commission rates to include any compensation for the buyer broker.

111. Home sellers would no longer be required to purchase the services of an as yet unidentified buyer broker as a prerequisite to entering the market.

**NAR's Oversight and Enforcement of its Anticompetitive Rules**

112. NAR has experienced success in requiring that its members – which include state and local REALTOR associations in the MLSs that comprise the real estate market of the District of South Carolina, as well as the few non-member brokers and agents who operate in geographic areas with MLSs operated by local REALTOR associations – comply with its anticompetitive rules and with other rules set out in the Handbook and NAR's Code of Ethics.

113. NAR requires that its members which own and operate MLSs comply with the mandatory provisions in the Handbook

and the Code of Ethics.  The Handbook states that

> Those associations or multiple listing
> services found by the National Association to
> be operating under bylaws or rules and
> regulations not approved by the National
> Association are not entitled to errors and
> omissions insurance coverage and their
> charters are subject to review and
> revocation. Handbook at 8.

114. Local REALTOR organizations own each of the MLSs
that comprise the real estate market of the District of South
Carolina and are required by NAR to monitor their MLS and MLS's
participants to ensure that they comply with mandatory provision
from the NAR Handbook.  Thus, each local REALTOR association and
MLS, and each participant in those association and MLSs, agrees
to the anticompetitive restraints challenged in this Complaint.
They further all play important roles in implementing and
enforcing those restraints.

115. Failure to strictly comply with the Code of Ethics
can lead to expulsion for NAR's individual and associational
members.  While references to the obligation of Member Boards are
found throughout the NAR's Constitution, Bylaws, and Code of
Ethics, NAR's Bylaws of the National Association, Article IV,
section 2, attached as Exhibit 4, is the most blunt statement of
the obligation.  It states that

> any Member Board which shall neglect or
> refuse to maintain and enforce the Code of
> Ethics with respect to the business
> activities of its members may, after due
> notice and opportunity for hearing, be

expelled by the Board of Directors from
membership in the National Association.

116. NAR's model rules for local REALTOR associations operating in the MLSs that comprise the real estate market of the District of South Carolina also require adherence to NAR's Code of Ethics.

117. NAR further penalized and discourages potential noncompliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules not approve by NAR. Ex. 1 at 8. NAR's position and monitoring of potential noncompliance includes conduct to oversee and monitor associations that operate in and transact business in the areas covered by the MLSs that comprise the real estate market of the District of South Carolina.

118. NAR reviews the governing documents of its local REALTOR associations, including those operating in the MLSs that comprise the real estate market of the District of South Carolina, to ensure compliance with NAR rules. NAR requires its local REALTOR associations, including those operating in the MLSs the comprise the real estate market of the District of South Carolina, to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review. The Corporate Defendants Designed, Joined, and Participated in the Conspiracy.

119. The Corporate Defendants have agreed to adopt,

31

promote, implement, and enforce the Adversary Commission Rule
through their active and direct involvement In NAR governance and
by imposing NAR rules on local real estate associations and the
Corporate Defendants' affiliated franchisees, brokers, and
employees.  By participating in an association which prevents
members from allowing their associates to compete with one
another for commissions (and which requires illegal tying
arrangements), and by agreeing to follow and enforce these
anticompetitive rules, the Corporate Defendants have joined the
conspiracy and acted to further its implementation and
enforcement.

        120. The Corporate Defendants have orchestrated,
joined, and participated in the conspiracy in at least four ways:
(1) the Corporate Defendants have required their franchisees (and
the agents or REALTORS employed by those franchisees) operating
in and transacting business in the MLSs that comprise the real
estate market of the District of South Carolina to comply with
NAR rules, including the Adversary Commission Rule, to access
those MLSs; (2) executives of the Corporate Defendants have
supervised NAR's operations, including NAR's adoption,
maintenance, and enforcement of the Adversary Commission Rule in
the MLSs that comprise the real estate market of the district of
South Carolina; (3) the Corporate Defendants have caused their
franchisees to influence local REALTOR associations within the

MLSs that comprise the real estate market of the District of South Carolina to adopt and enforce NAR's rules, including the Adversary Commission Rule, as a condition of listing properties on those MLSs that comprise the real estate market of the District of South Carolina.

121. First, the Corporate Defendants implemented the conspiracy by requiring that their franchisees (and by necessary implication, the franchisees agents and REALTORS) in the geographic areas in which the MLSs operate to comply with NAR's rules, including the Adversary Commission Rule.

122. Franchise agreements between the Corporate Defendants and their franchisees require those franchisees and their agents to (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the local REALTOR association; and (c) participate in and comply with the rules of the local MLS, which include the mandatory rules of the NAR Handbook. Each of the Corporate Defendants is party to one or more agreements with subsidiaries, franchisees, and/or affiliates that are located in this District and that transact business in this District.

123. Second, executives from the Corporate Defendants, one of the largest real estate brokerage franchises in the county, have actively participated in the management and operation of NAR. Senior executives of the Corporate Defendants have served on NAR's governing board of directors.

124. Both NAR's Handbook and its Code of Ethics were drafted, developed, and promulgated by NAR's board of directors or NAR's Professional Standards Committee.

125. NAR's day-to-day operations are managed by an eight person Leadership Team.

126. Third, executives of franchisees of the Corporate Defendants have participated in the governance of the local REALTOR associations that own and operate the MLSs that comprise the real estate market of the District of South Carolina (and other local REALTOR associations) and they implement the conspiracy through those associations. Those executives and local REALTOR association require compliance with the NAR rules, including the Adversary Commission Rule, and adopted standard form contracts to implement these NAR rules.

127. The Corporate Defendant actively encourages their franchisees to be involved in local REALTOR association governance. Keller Williams' "Policy & Guidelines Manual" encourages its agents to participate "to the greatest possible extent" in state NAR associations and "to take an active role in" local REALTOR associations. The manual further stresses cooperation with other REALTORS: "We cooperate and live by the spirit of cooperation with all other REALTORS® and brokers."

128. Accordingly, in each of the areas in which the MLSs that comprise the real estate market in the District of

34

South Carolina operate, the franchisees of the Corporate
Defendants have joined and furthered the conspiracy through their
collusion with local REALTOR associations to implement, comply
with, and enforce the NAR's rules.

### EFFECTS OF THE CONSPIRACY

129. Defendants' conspiracy has had the following
anticompetitive effects, among others, in each area in which the
MLSs that comprise the real estate market in the District of
South Carolina operate:

> a.  Home sellers have been forced to pay
>     commissions to buyer brokers- who represent their
>     adversaries in negotiations to sell their homes –
>     thereby substantially inflating the cost of
>     selling their homes;
>
> b.  Home sellers have been compelled to set a high
>     buyer-broker commission to induce buyer brokers to
>     show their homes to the buyer broker's clients;
>
> c.  By paying inflated buyer broker commissions, home
>     sellers have paid inflated total commissions;
>
> d.  The retention of a buyer broker has been severed
>     from the setting of the broker's commission; the
>     home buyer retains the buyer broker while the home
>     seller's agent sets the buyer broker's
>     compensation;

e.  Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to sell homes;

f.  Buyer broker compensation is insensitive to factors a competitive market would place value on, like experience, level of service, and local connections, instead being set by the sales price of the house purchased and the "customary" percentage buyer commission offered;

g.  Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission;

h.  The Corporate Defendants and their franchisees have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions;

i.  Home sellers have been forced to purchase services they do not want, the services of an unidentified buyer broker, at the time they purchase services that they do want, the services of a seller broker with access to the local geographic MLS;

j.  Commissions have been removed as part of the negotiating process between seller and buyer, as

they are now a take-it-or-leave-it proposition.

130. Plaintiffs are not aware of any pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition.  The Defendants' conspiracy is simply an attempt to perpetuate the previous, historical system that also required the home seller to pay the commission of the buyer broker.

131. To the extent Defendants argue that the MLS system itself has certain pro-competitive benefits, none of these benefits derive from the anticompetitive rules and regulations promulgated by the NAR to protect the inflated commissions of buyer brokers.

132. Even if some alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

133. Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer broker commissions paid by home sellers, at levels above what similarly developed markets without the anticompetitive effects of the NAR's policies have.

134. Compared to other countries with competitive markets for residential real estate brokerage services, the commission in the MLSs that comprise the real estate market of the District of South Carolina are substantially higher.

Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States. This article is attached as Exhibit 5.

135. Delcoure and Miller concluded that "most of the other highly industrialized nations" had much lower total residential commission rates, with the UK seeing a total commission rate of less than 2%, 3.14 % in New Zealand and South Africa, and a total commission rate of around 3% in Singapore.

136. These economists also found that, in particularly competitive areas of the UK, total commission rates ran as low as half to three quarters of a percent, but could be as high as 3.5%.  This makes sense, as the market in each of those areas is sensitive to competitive factors, unlike the markets of the District of South Carolina.

137. Delcoure and Miller ultimately found that US residential brokerage fees should run closer to 3% than the 5-6% at which they currently run.

138. Other economists have reached similar conclusions. A Professor of Economics at Cornell University has described the Adversary Commission Rule as a "structural hurdle" preventing innovation and price competition in the real estate market.  This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of the United States or the District of South Carolina's

real estate market.

139. The Adversary Commission Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the "standard" commission practices and rates. Keller Williams, through material prepared for its "Keller Williams University" program used to train REALTORS, has boasted that standard real estate commissions have stabilized at six percent.  The Adversary Commission Rule enables buyer brokers to identify and compare the buyer broker compensation offered by every seller in the MLSs that comprise the real estate market of the District of South Carolina and then steer their client toward home offering higher commissions.  Defendant Keller Williams has even trained its seller brokers to persuade home sellers not to reduce the buyer broker commission to be offered and do so on the presumption that steering is widespread and will occur.

140. Further, by requiring the seller to make a unilateral blanket offer of compensation to a buyer broker, that buyer broker, who owes duties of good faith and fair dealing to his client the buyer, is incentivized to steer his client to a more expensive house because his commission in real dollars will increase with the purchase price of the house.

141. The practice of steering, confirmed by the economic literature and by Defendants' own training materials, has manifest anticompetitive effects.  Steering deters reductions

39

from the "standard" commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering discounts.  Steering also creates significant agency costs by misaligning the buyer brokers's incentives and the best interests of the buyer broker's client.

142. The Corporate Defendants, and their franchisees and brokers and other co-conspirators, also use software technology to help facilitate steering based on MLS commission information.  They have further taken actions to prevent buyers from learning about properties that offer discount buyer broker commissions.

143. CoreLogic is a software technology company that provides software and data services to many MLSs around the country and, upon information and belief, to the MLSs that comprise the real estate market of the District of South Carolina.  The software program is called Matrix.

144. Matrix has feature that allow brokers to filter listings by the buyer broker commission being offered, which means that the buyer broker can use Matrix to ensure that his or her clients only receive information about potential homes offering buyer broker commission in a desired range.

145. In addition, NAR has enacted certain other rules and policies – which the Corporate Defendants have helped draft and then abided by, agreed to, and implemented – that further

exacerbate the anticompetitive effect of steering.  The offered buyer broker commission is specified in only certain ways to make it easy for REALTOR participants to see and compare those commission rates.

146. Defendants have ensured that, while REALTORS may easily find information regarding buyer broker commission offers, regular home buyers and sellers are not able to see that information.  NAR further prohibits such information from being shared through data sharing arrangements with third-party websites or other MLS syndication services.

147. By simultaneously mandating the sharing of this information between REALTOR participants and forbidding the sharing of this information with buyer and seller participants, the NAR and the Corporate Defendants have managed to create a one-way flow of price information.  This prevents price competition that could benefit consumers while driving REALTOR participants to cooperate to maximize their total commission.

148. Further, this price concealment allows those REALTORS who wish to perpetuate the system, to include the Corporate Defendants, to punish brokers and REALTORS who deviate from the "standard" commission with impunity.

149. Because home sellers and buyers do not have access to the blanket, unilateral offer of buyer broker compensation, they have no ability to detect steering by buyer brokers.

150. The economic evidence is plain that the Adversary Commission Rule works to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise should.

151. Defendants' conspiracy and the Adversary Commission Rule was designed to keep real estate commissions at elevated, supra-market levels, and Defendants have managed to keep the "standard" commission at 6%, despite significant social and technological changes that should have driven those cost down substantially.

152. Moreover, Defendants' conspiracy and the Adversary Commission Rule was designed to keep real estate agents who otherwise would not have been competitive in business.  By providing a "standard" commission, buyer brokers are not subject to the rigors of the marketplace and, thus, inefficient agents are not forced either to become competitive or go out of business.

153. This conspiracy, the Adversary Commission Rule, and the tying of buyer broker services to seller broker services, shelters real estate agents who are not able to compete in the market on those terms the market would consider favorable – price, experience, actual work performed, levels of service, etc..

154. By providing infrastructure, branding, and

42

training, the large national real estate brands are able to provide lower costs to their franchisees.  Because experience and level of service is not properly valued by the market, costs are made the differentiator between successful buyer brokers and unsuccessful ones. Those buyer brokers able to keep costs down are able to better succeed while those local REALTORS who do not have large brands to rely on are comparatively less successful.

155.  Indeed, the large, national brands are able to provide their franchisees substantial subsidies in order to out compete local real estate agents – agents who would receive premium fees because they have better local connections, understand the level of service necessary to sell in a particular market, etc. – because the market is so distorted by the Adversary Commission Rule.

156. Local agents, however, are unable, as discussed below, to create MLS services that compete with the one owned and operated by the NAR's local affiliates under the auspices of the NAR itself.  As such, they are forced to compete in the market as distorted by the Defendants, both Corporate and the NAR.

157. Further, local agents, given the fact the market is unable to properly value many competitive factors correctly due to the Defendants' market distortions, are forced to become local franchisees of the Corporate Defendants.  In this way, the Corporate Defendants are able to perpetuate themselves.

158. The Corporate Defendants, along with other large realty companies, have sufficient control over NAR that they effectively are able to dictate the policies of the NAR and, as such, local real estate agents are provided take it or leave it policies to which they must adhere.  Should they choose not to adhere to those policies, then they are effectively unable to stay in business.

**RELEVANT MARKETS AND DEFENDANTS' MARKET POWER**

159. The relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to the MLSs that comprise the real estate market of the District of South Carolina.

160. Defendants' control of the MLSs that comprise the real estate market of the District of South Carolina allows Defendants to impose the Adversary Commission Rule and other anticompetitive NAR rules on Class members and other market participants.  Access to the MLSs that comprise the real estate market of the District of South Carolina is critical for brokers to compete and to assist home buyers and sellers in the District of South Carolina.

161. The relevant geographic markets for the claims asserted herein is the District of South Carolina wherein the MLSs that comprise the real estate market of South Carolina

operate.  Nearly all homes sold in these geographic areas were listed on those MLSs by brokers that are subject to the MLS and NAR rules and standards.

162. Buyers and Sellers generally work with local real estate agents who are members of the local MLS where the property to be bought or sold is located.

163. The Corporate Defendants, through their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

164. Any buyer brokers in the areas in which the MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers.  Defendants' effective control of the MLSs that comprise the real estate markets of the District of South Carolina through their co-conspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service.

165. A seller's broker without access to a listing service like the MLSs that comprise the real estate market of the District of South Carolina would be unable to reach the large majority of potential buyers and a broker who represented a buyer without using a listing service would lose access to the large

majority of sellers.  Brokers cannot compete effectively without access to a listing service.

166. For an alternative listing service to effectively compete with one of the MLSs subject to the NAR's rules, the alternative listing service would need to have listings as comprehensive as (or at least nearly so) as the MLS subject to the NAR's rules.  But brokers and their individual REALTORS or agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower total commissions and lower buyer broker commissions and seller broker commissions.

167. Further, many buyers would be reluctant now to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission when other buyer brokers operating on an MLS subject to the NAR's rules are entirely compensated by home sellers.

168. Lastly, the Defendants would not allow such an alternative listing service to exist.  The Corporate Defendants would not allow their listings to appear on such an alternative listing service and the NAR, by and through its local affiliates, would not provide those listing on such a service professional liability insurance.  In other words, many of the current agents listing on the MLSs that comprise the real estate market of the

District of South Carolina would be immediately shorn of the many services provided to them by the Defendants and be forced either to fly or fall in a brave but dangerous world totally unlike the safe, relatively uncompetitive one in which they currently live.

169. Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers. Any listing service attempting to compete with any of the existing MLSs that comprise the real estate market of the District of South Carolina would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLSs. The absence of listing services that compete with the existing MLSs that comprise the real estate market of the District of South Carolina reflects these and the above discussed barriers to entry.

170. As an additional impediment to potential competition, NAR advises MLSs to enter in to non-compete agreements with third-party websites so that those websites do not become competitive rivals to MLSs. NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensations." [need citation] The

non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service."  NAR has thus advised MLSs to take affirmative steps to further the conspiracy by preventing third party websites from becoming possible competitors.

171. NAR has also previously taken actions to stifle innovation and competition among real estate brokers, including actions which have led the Antitrust Division of the Department of Justice to file a number of lawsuits over the years in which the NAR has repeatedly either agreed to change the policies at issue or been found to be acting under explicit price fixing arrangements.

## CONTINUOUS ACCRUAL

172. During the four years preceding the filing of this Complaint, Defendants, through their co-conspirator brokers in the MLSs that comprise the real estate market of the District of South Carolina, repeatedly charged and received buyer broker commissions and total commissions that were inflated as a result of the conspiracy.

173. These inflated commissions during the preceding four years were paid by Plaintiffs and the other Class members in connection with the sale of residential real estate listed on one of the MLSs the comprise the real estate market of the District of South Carolina.

174. Each payment of these inflated commissions by Plaintiffs and the other Class members during the last four years injured them and gave rises to a new cause of action for that injury.

175. During the last four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Adversary Commission Rule and other anticompetitive NAR rules nationwide, including in the MLSs that comprise the real estate market in the District of South Carolina.

**CLASS ACTION ALLEGATIONS**

176. Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of "the South Carolina MLS Class," asserting Count I, defined as:

> All persons who, from November 6, 2019 through the present, used a listing broker affiliated with Keller Williams Realty, Inc. in the sale of a home listed on one of the MLSs that comprise the real estate market of the District of South Carolina.

177. Excluded from the Classes are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Classes are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of

49

their law firms.

178. The Classes are readily ascertainable because records of the relevant transactions should exist.

179. The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Classes have many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

180. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes.

181. Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

a.  Whether Defendants engaged in the alleged conspiracy;

b.  Whether the conspiracy was implemented in the areas in which the MLSs that comprise the real estate market in the District of South Carolina operate;

c.    Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Classes;

d.    Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions in the areas in which the MLSs that comprise the real estate market in the District of South Carolina operate;

e.    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

f.    Whether Plaintiffs and the other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

g.    Whether Defendants' conduct is unlawful; and

h.    The appropriate class-wide measures of damages.

182. Plaintiffs' claims are typical of the claims of the members of the Classes because their claims arise from the same course of conduct by Defendants and the relief sought within the Classes is common to each member.

183. Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation to represent themselves and the Classes. Together Plaintiffs and

their counsel intend to prosecute this action vigorously for the benefit of the Classes. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

184.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Classes would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Classes to seek redress for the violations of law alleged herein.

185. Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b.    The prosecution of separate actions by individual

Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

### ANTITRUST INJURY

186. Defendants' anticompetitive agreements and conduct have had the following effects, among others discussed above:

a.    Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

b.    Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

c.    Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers;

d.    Home sellers have been forced to purchase services that they did not want, namely buyer broker

53

services, in exchange for buying services that
they did want, namely seller broker services; and

e.    The Corporate Defendants and their franchisees
have inflated their profits by a significant
margin by the increased total commission and
increased buyer broker commissions;

187. By reason of the violations of antitrust laws,
Plaintiffs and the Class have sustained injury to their business
or property, having paid higher total commissions than they would
have paid in the absence of Defendants' anticompetitive
conspiracy and, as a result, have suffered damages.

188. There are no pro-competitive effects of the
Defendants' conspiracy that are not substantially outweighed by
the conspiracy's anticompetitive effects.

189. Significant economic evidence supports concluding
that Defendants' conspiracy has resulted in Class members paying
buyer broker commissions and total commission that have been
inflated to a supra-market level in the areas in which the MLSs
that comprise the real estate market of the District of South
Carolina operate.

190. This is an antitrust injury of the type that the
antitrust laws were meant to punish and prevent.

## CLAIMS FOR RELIEF

### COUNT ONE:
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

**Against All Defendants**

191. Plaintiffs reallege and incorporate by reference each paragraph above as if repeated verbatim herein.

192. Beginning more than four years before the filing of this Complaint, and continuing to the present day and likely to continue unless and until an injunction is issued in this case, Defendants engaged in, and continue to engage in, a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

193. The conspiracy herein alleged consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

194. In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

    a.   Participated in the creation, maintenance, re-publication, and implementation of the Adversary Commission Rule and other anticompetitive NAR rules;

    b.   Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the

Adversary Commission Rule and other
anticompetitive NAR rules in the areas in which
the MLSs that comprise the real estate market of
the District of South Carolina operate; and

c.    Requiring franchisees of the Corporate Defendants
and others to implement the Adversary Commission
Rule and other anticompetitive NAR rules in the
areas in which the MLSs that comprise the real
estate market of the District of South Carolina
operate, which each Corporate Defendant does
through its franchise agreements, policy manuals,
and other contracts with its franchisees,
affiliates, subsidiaries, and REALTORS.

195. Defendants' conspiracy has required sellers to pay
buyer brokers, to pay those buyer brokers an inflated commission
and an inflated total commission, and it has restrained price
competition among buyer brokers in the areas in which the MLSs
that comprise the real estate market of the District of South
Carolina operate. This harm to competition substantially
outweighs any competitive benefits arising from the conspiracy.

196. Defendants' conspiracy has caused buyer-broker
commissions and total commissions in the areas in which the MLSs
that comprise the real estate market of the District of South
Carolina operate to be inflated. Plaintiffs and the other members

of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on one of the MLSs that comprise the real estate market of the District of South Carolina. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer and, to the extent the seller obligated herself to pay the buyer broker, that price would have been the subject of negotiation between the seller and the buyer.

197. Defendants' conspiracy is a per se violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

198. In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

199. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, requests relief and prays for judgment against Defendants as follows:

A.    An Order certifying the Classes under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Classes;

B. Declarations that the actions of Defendants, as set forth above, are unlawful;

C. A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from:

(1) requiring that sellers pay the buyer broker,

(2) continuing to restrict competition among buyer brokers and seller brokers, and

(3) engaging in any conduct determined to be unlawful;

D. Appropriate injunctive and equitable relief;

E. An award to Plaintiffs and the other members of the Classes for damages and/or restitution in an amount to be determined at trial;

F. An award of pre- and post-judgment interest to Plaintiffs;

H. An award to Plaintiffs for their costs of suit, including reasonable attorneys' fees and expenses;

I. An award of such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial of all issues so triable.

KNIE & SHEALY

*/s/ Patrick E. Knie*

Patrick E. Knie
Federal I.D. No. 2370
Matthew W. Shealy
Federal I.D. No. 12823
P.O. Box 5159
250 Magnolia Street
Spartanburg, S.C.  29304
Telephone No.  (864) 582-5118
Telefax No.    (864) 585-1615

Mitch Slade
MITCH SLADE LAW OFFICE, P.A.
Federal I.D. No. 5352
P.O. Box 1007
Spartanburg, S.C.  29304
Telephone: (864) 582-4212
mitch@mitchsladelaw.com

ATTORNEYS FOR PLAINTIFFS

November 6, 2023